IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(Bid Protest)

No. 232-545
Senior Judge Smith

PREDICTIVEIQ, LLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

## DEFENDANT'S MOTION TO DISMISS AND RESPONSE TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL

STEVEN J. GILLINGHAM
Assistant Director

CHRISTIAN H. ROBERTSON
Trial Attorney
Air Force Judge Advocate General's Corps
U.S. Air Force

ELIZABETH M.D. PULLIN
Trial Attorneys
Commercial Litigation Branch
Civil Division

MAX V. KIDALOV
Attorney-Advisor (Contracts)
Air Force Office of General Counsel
Legal Counsel to
 the Department of the Air Force Small Business
Programs
Office of the Secretary of the Air Force

U.S. Department of Justice
P.O. Box 480 | Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-3867
elizabeth.m.pullin@usdoj.gov

*Attorneys for the United States*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................... 2

STATEMENT OF THE ISSUES.......................................................................... 3

STATEMENT OF FACTS ................................................................................... 4

    I.     Background ........................................................................................... 4

          A.    The Small Business Innovation Research Program..................... 4

          B.    Advances In The DoD Acquisition Process To Align With Civilian Practices ..................................................................... 5

          C.    In-Space Servicing, Assembly and Manufacturing .................... 7

    II.    The Air Force's Commercial Solutions Opening (CSO), Contemplated Many Separate and Independent Procurements Of Research and Development .......................................................... 8

          A.    PredicitveIQ's Proposal In Response To The Commercial Solutions Opening (CSO), AFX234-DCS01, The Orbital Prime Topic........................................................................... 11

          B.    Air Force Evaluated PredictiveIQ's Proposal On Its Own Merit Without Considering Other Proposed Topic Solutions................... 11

          C.    Procedural History ................................................................. 12

          D.    Air Force Voluntary Stayed Funding Agreements Awarded For The Orbital Prime Topic Out Of An Abundance Of Caution................................................................................. 13

          E.    The Air Force Determined The Automatic Stay Provision Of The Competition In Contracting Act Does Not Extend To All Funding Agreements Resulting From This Commercial Solutions Opening................................................................. 14

LEGAL STANDARDS ...................................................................................... 15

    I.     Motion To Dismiss ............................................................................. 15

    II.    Legal Standards for a Preliminary Injunction.................................... 16

ARGUMENT..................................................................................................... 17

    I.     PredictiveIQ Lacks Standing Because It Is Not An Interested Party To Other Small Businesses's Contracts............................................ 17

          A.    PredicitiveIQ Is Not An Interested Party As Defined in 31 U.S.C. § 3551 ...................................................................... 18

B.    PredictiveIQ Does Not Have A Direct Economic Interest In The SBIR D2P2 Awarded Funding Agreements ..................................... 20

II.    PredictiveIQ Is Not Likely To Succeed On The Merits Because This CSO Contemplated Numerous, Separate Contracts .................................... 21

    A.    The Automatic Stay Provisions of CICA Do Not Require The Air Force To Stay The Award Or Performance Of Contracts Which Resulted From Procurements Other Than The Protested Procurement ...................................................................... 21

    B.    A Procurement Subject To A Stay Is The One Pertaining To The Particular Government Need At Issue.......................................... 22

    C.    The SBIR CSO At Issue Contemplated Multiple Procurements......................................................................................... 24

    D.    The Automatic Stay Provisions Do Not Extend To Procurements Other Than The Procurement PredictiveIQ Protested...................................................................................................... 26

III.    PredictiveIQ Has Failed To Establish That It Will Be Irreparably Harmed Before Its GAO Challenge Concludes.................................................... 28

IV.    The Balance of Harms Outweighs Any Speculative Harm To PredictiveIQ ..................................................................................................... 31

    B.    Numerous SBIR Phase II Awardees Would Be Harmed By An Injunction ...................................................................................... 32

V.    If The Court Grants PredictiveIQ's Request, PredictiveIQ Must Provide A Bond.................................................................................................. 34

CONCLUSION.................................................................................................................. 36

ii

Protected Information To Be Disclosed Only In Accordance With The U.S. Court of Federal Claims Protective Order

# TABLE OF AUTHORITIES

**CASES**            **PAGE(S)**

*AeroSpray, Inc. v. United States,*
156 Fed. Cl. 548 (2021) ........................................................................ 19, 33

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.,*
840 F. Supp. 2d 327 (D.D.C. 2012) ........................................................ 28

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.,*
239 F.3d 1343 (Fed. Cir. 2001) .............................................................. 17

*Amazon Web Services, Inc. v. United States,*
147 Fed. Cl. 146 (2020) .......................................................................... 31

*Armour of Am. v. United States,*
69 Fed. Cl. 587 (2006) ............................................................................ 15

*Axiom Resource Mgmt, Inc. v. United States,*
564 F.3d 1374 (2009) .............................................................................. 34

*Bona Fide Conglomerate, Inc. v. United States,*
96 Fed. Cl. 233 (2010) ...................................................................... 34, 35

*Central Freight Lines v. United States,*
87 Fed. Cl. 104 (2009) ............................................................................ 15

*Chapman Law Firm Co. v. United States,*
67 Fed. Cl. 188 (2005) ............................................................................ 28

*D&J Enter. V. United States,*
159 Fed. Cl. 808 (Fed. Cl. 2022) ........................................................... 22

*EH Grp., Inc.,*
B-419946.2, Mar. 25, 2022 ..................................................................... 28

*Eskridge & Assocs. v. United States,*
955 F.3d 1339 (Fed. Cir. 2020) ........................................................ 18, 20

*Filtration Dev. Co. v. United States,*
63 Fed. Cl. 418 (2005) ............................................................................ 16

*FMC Corp. v. United States,*
3 F.3d 424 (Fed. Cir. 1993) .................................................................... 17

*Franchise Tax Bd. v. Constr. Laborers Vacation Trust,*
463 U.S. 1 (1983) .................................................................................... 16

iii

*Ginn Grp., Inc. v. United States,*
159 Fed. Cl. 593 (2022) ............................................................................... 27

*Heritage of Am., LLC v. United States,*
77 Fed. Cl. 66 (2007) .................................................................................. 29

*Holley v. United States,*
124 F.3d 1462 (Fed. Cir. 1997) ................................................................... 16

*IBM v. United States,*
118 Fed. Cl. 677 (2014) ............................................................................... 16

*Int'l Equity Inv. v. Opportunity Equity,*
441 F. Supp. 2d 552 (S.D.N.Y. 2006) .......................................................... 35

*Kinnemetrics v. United States,*
155 Fed. Cl. 777 (2021) ............................................................................... 27

*Lermer Germany GmbH v. Lermer Corp.,*
94 F.3d 1575 (Fed. Cir. 1996) ............................................................... 16, 31

*Litton Sys., Inc. v. Sundstrand Corp.,*
750 F.2d 952 (Fed. Cir. 1984 ..................................................................... 16

*MCS Mgmt., Inc. v. United States,*
48 Fed. Cl. 506, 511 (2001) ........................................................................ 16

*MercExchange, L.L.C. v. eBay, Inc.,*
500 F. Supp. 2d 556, 586 (E.D. Va. 2007) ................................................. 33

*Monsanto Co. v. Geertson Seed Farms,*
561 U.S. 139 (2010) ..................................................................................... 16

*Night Vision Corp. v. United States,*
469 F.3d 1369 (Fed. Cir. 2006), *cert. denied,*
550 U.S. 934 (2007) ....................................................................................... 3

*OAO Corp. v. United States,*
49 Fed. Cl. 478 (2001) ........................................................................... 16, 23

*PGBA, LLC v. United States,*
389 F.3d 1219 (Fed. Cir. 2004) .................................................................. 17

*PGBA, LLC v. United States (PGBA I),*
57 Fed. Cl. 655 (2003) ................................................................................. 29

*PIN/NIP, Inc. v. Platte Chem. Co.,*
304 F.3d 1235 (Fed. Cir. 20020) ................................................................ 15

*Qingdao Taifa Grp. v. United States,*
581 F.3d 1375 (Fed. Cir. 2009) .................................................................. 28

*Reynolds v. Army & Air Force Exch. Serv.*,
  846 F.2d 746 (Fed. Cir. 1988) ................................................................ 15

*Rex Serv. Corp. v. United States*,
  448 F.3d 1305 (Fed. Cir. 1996) ...................................................... 18, 19

*RhinoCorps Ltd. Co. v. United States*,
  87 Fed. Cl. 261 (2010) ........................................................................ 17

*SEKRI, Inc. v. United States*,
  Fed. Cl. No. 21-778, 2023 WL 1428644 (Fed. Cl. Jan. 31, 2023) ........................... 32

*Silfab Solar, Inc. v. United States*,
  892 F.3d 1340 (Fed. Cir. 2018) ............................................................. 16

*SMC Corp., Ltd. v. Lockjaw, LLC*,
  481 F. Supp. 2d 918 (N.D. Ill. 2007) ....................................................... 35

*Squire Solutions, Inc. v. United States*,
  156 Fed. Cl. 249 (2021) ................................................................ 23, 24

*Supreme Foods GmbH v. United States*,
  109 Fed. Cir. 369 (2013) .................................................................... 34

*Taylor v. United States*,
  303 F.3d 1357 (Fed. Cir. 2002) ............................................................. 15

*Toyon Research Corp.*,
  B-409765, Aug. 5, 2014, 2014 CPD ¶ 235 ....................................................... 3

*Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*,
  338 F.3d 1353 (Fed. Cir. 2003) ............................................................. 15

*United States v. IBM Corp.*,
  892 F.2d 1006 (Fed. Cir. 1989) ........................................................ 16, 17

*Weeks Marine, Inc. v. United States*,
  575 F.3d 1352 (Fed. Cir. 2009) ........................................................ 17, 18

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................ 15, 28, 30

*Zeidman Technologies v. United States*,
  144 Fed. Cl. 294 (2019) ..................................................................... 20

*Zenith Radio Corp. v. United States*,
  710 F.2d 806 (Fed. Cir. 1983) ............................................................. 28

## STATUTES

10 U.S.C. § 2304 ................................................................................................................... 6

10 U.S.C. § 2371b(f)(5) ....................................................................................................... 6

15 U.S.C. § 631 ............................................................................................................... 4, 24

15 U.S.C. § 638(e)(4) ........................................................................................................... 4

15 U.S.C. § 638(e)(4)(B) ..................................................................................................... 4

15 U.S.C. § 638(f) ................................................................................................................ 3

15 U.S.C. § 638(g) ..........................................................................................................4, 33

15 U.S.C. § 638(j)(1) .......................................................................................................... 4

28 U.S.C § 1491(b) ............................................................................................................ 16

28 U.S.C. § 1491(b)(1) ................................................................................................. 17, 18

31 U.S.C. §§ 3551-56 ................................................................................................... 18, 19

31 U.S.C. § 3553 ...................................................................................................... 13, 15, 31

31 U.S.C. § 3553(c)(1) ................................................................................................. 14, 22

31 U.S.C. 3553(d) ........................................................................................................ 22, 34

## OTHER AUTHORITIES

*Defense Federal Acquisition Regulation Supplement: Defense Commercial Solutions Opening (DFARS Case 2022–D006)*,
  88 Fed. Reg. 6605 (January 31, 2023) ......................................................................... 22

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
Bid Protest

|  |  |  |
|---|---|---|
| PREDICTIVE, LLC, | | |
| | Plaintiff, | No. 23-cv-545 |
| v. | | (Senior Judge Smith) |
| THE UNITED STATES, | | ▆▆▆▆▆▆▆▆▆ |
| | Defendant. | |

## DEFENDANT'S MOTION TO DISMISS, OR, IN THE ALTERNATIVE, DEFENDAN'TS RESPONSE TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to Rules 12(b)(1), and 65 of the Rules of the United States Court of Federal Claims (RCFC), the United States respectfully requests that the Court dismiss, or in the alternative deny the motion for a preliminary injunction filed by plaintiff, PredictiveIQ, LLC (PredictiveIQ or Predictive). Pl. Mot., ECF No. 2; *see also* Pl. Memo. In Supp. Of Pl.'s Mot., ECF No. 3 ("Pl. Mem."). PredictiveIQ seeks to enjoin the United States Air Force and the United States Space Force from permitting up to 147 small businesses who received funding agreement awardees in this direct to Phase II Small Business Innovative Research (SBIR) awards resulting from a Commercial Solutions Opening (CSO) from performing in furtherance of each of their distinctive research projects. For the reasons explained below, PredictiveIQ's motion should be dismissed. But if this Court chooses not to dismiss the complaint, then, PredictiveIQ's motion for a preliminary injunction should be denied. If PredictiveIQ's motion is not denied, then, pursuant to RCFC 65(c), the United States requests security in the amount of $1,350,425.07, if a preliminary injunction is issued.

## INTRODUCTION

PredictiveIQ seeks a preliminary injunction prohibiting the Air Force from allowing numerous (at best 30, and at worst 147) SBIR Research and Development (R&D) contractors to continue working after they were awarded contracts, and PredictiveIQ protested post award to the U.S. Government Accountability Office (GAO). However, PredictiveIQ's motion ignores that fact that that the Solicitation at issue in this case is a Commercial Solutions Opening (CSO), which is a broad announcement that the Air Force was accepting proposals for R&D efforts, which, therefore resulted in numerous separate contracts, each of which were distinct lines of R &D effort. PredictiveIQ's GAO protests the decision not to award it a contract under the CSO. . At issue specifically is the broad area of interest, In-space Servicing Assembly and Manufacturing (ISAM), topic no. AFX234-DCSO1. ISAM is a suite of enabling technologies supporting a myriad of space capabilities for space faring activities, in particular the national defense, and private industry. As PredictiveIQ lacks standing as an interested party with a direct economic interest in other small businesses' SBIR contracts, the United States respectfully requests the Court dismiss the Complaint. Additionally, because the statutory underpinnings of the SBIR program and the CSO acquisition method expands the Air Force's discretion to unilaterally, identify research and development topics, receive proposals, evaluate the proposals and determine awardees, PredictiveIQ cannot meet the exacting standards required to qualify for a preliminary injunction. Indeed, even if the Court were to take jurisdiction of this matter, the injunctive factors each weigh in favor of the United States. Accordingly, the United States respectfully requests that the Court deny PredictiveIQ's motion for a preliminary injunction.

## STATEMENT OF THE ISSUES

1.      Whether PredictiveIQ lacks standing to challenge the award or continued performance of numerous other Direct -to- Phase II SBIR funding agreements awarded to other small business concerns.

2.      Whether this Court should enjoin, at best 30, or at worst147, awarded SBIR phase II funding agreements for innovative R&D and prototyping efforts while PredictiveIQ pursues its post award bid protest at the GAO given that:

         a.   The Air Force has voluntarily stayed two awarded SBIR ISAM funding agreements, the sum of each of the agreements' value maintains the *status quo*;

         b.   PredictiveIQ is not likely to succeed on the merits when this Small Business Innovation and Research Program CSO contemplated numerous independent procurements, and not a traditional, single procurement for a single requirement;

         c.   PredictiveIQ will not suffer irreparable harm absent a preliminary injunction;

         d.   The balance of hardships and the public interest weigh against the Court enjoining the direct-to-Phase II SBIR funding agreements.

3.      Should the Court find that PredictiveIQ has met the "exacting standards" required for the Court to issue a preliminary injunction, whether PredictiveIQ should post an appropriate bond, $673,809. pursuant to Rule 65(c) during the pendency of PredictiveIQ's post-award GAO bid protest.

## STATEMENT OF FACTS

I.    Background

    A.    The Small Business Innovation Research Program

The Small Business Innovation Research SBIR Program was originally established by the

Small Business Innovation Development Act of 1982, P.L. 97-219 (15 U.S.C. § 631 et seq.), to

"assist small-business concerns in obtaining and performing research and development work." *See*

*Night Vision Corp. v. United States*, 469 F.3d 1369, 1371 (Fed. Cir. 2006), *cert. denied*, 550 U.S.

934 (2007); *Toyon Research Corp*., B-409765, Aug. 5, 2014, 2014 CPD ¶ 235 at 1-4.  The SBIR

program is administered by certain Federal agencies such as the Department of Defense (DoD)

and the Air Force.  15 U.S.C. § 638(f).  The SBIR program is divided into three phases, that are

uniform across the Government.  15 U.S.C. § 638(e)(4).  Phase II SBIR awards, relevant here, are

focused on the scientific and technical merit and feasibility of the proposals, . . . considering,

among other things, the proposal's commercial potential."  15 U.S.C. § 638(e)(4)(B).

Congress directed the Small Business Administration (SBA) to issue a Policy Directive

(PD) with generalized guidance for administering the SBIR Program throughout the Federal

Government. 15 U.S.C. § 638(j)(1).  In general, Phase II SBIR awards "must be awarded

pursuant to competitive and merit-based selection procedures." Id. § 638(s).  The relevant PD in

effect in 2022 was the October 1, 2020 version.[1]  In 15 U.S.C. § 638(g), Congress gave SBIR

agencies such as the Air Force broad "unilateral" powers over SBIR topics selection, proposal

evaluations, and awards.  *See also,* SBA's PD Section 9 ("Unilaterally receive and evaluate

_____

[1]  The October 1, 2020 PD version is the combination of Final Rule promulgated by the SBA at 84 Fed. Reg. 12794 (April 20, 2019) and, and Notice of Technical Amendment promulgated by the SBA at 85 Fed. Reg. 50062 (17 August 2020).  The entire October 1, 2022 PD version is found at:
https://www.sbir.gov/sites/default/files/SBA_SBIR_STTR_POLICY_DIRECTIVE_OCT_2020_v2.pdf

proposals resulting from Program Solicitations, [and] select [a]wardees, issue [f]unding [a]greements . . ."). The PD directs that agencies "obtain the greatest degree of creativity and innovation consistent with the overall objectives of the SBIR . . . program." *Id.*, at Appendix I, Section 9. Additionally, this direction is supported by ban on Essentially Equivalent Work[2] in Section 7(d) of the PD ("Essentially Equivalent Work must not be funded in the SBIR/STTR or other Federal Agency programs, unless an exception to this rule applies.").

Historically, SBIR solicitation and evaluation process borrowed elements from FAR 35.016 (Broad Agency Announcement or BAA), which "may be used by agencies to fulfill their requirements for scientific study and experimentation directed toward advancing the state-of-the-art or increasing knowledge or understanding rather than focusing on a specific system or hardware solution," and which "shall only be used when meaningful proposals with varying technical/scientific approaches can be reasonably anticipated." Additionally, evaluations under a BAA are not evaluated against each other since they are not submitted in accordance with a common work statement." *Id.*

B.      Advances In The DoD Acquisition Process To Align With Civilian Practices

In recent years, Congress and the DoD have attempted to enhance the ability of small businesses, particularly those in innovative, technical fields, to contract with the DoD and the military amid criticism that the DoD's procurement systems were too cumbersome or slow to provide return on investments. *DIUx Commercial Solutions Opening How-to Guide* 1 (Nov. 30, 2016), *available at* https://apps.dtic.mil/dtic/tr/fulltext/u2/1022451.pdf. Thus, in 2016, DoD's Defense Innovation Unit (DIUx) developed a pilot program and novel procurement method, the

---

[2] Essentially Equivalent work is work "that is substantially the same research . .. where a specific research objective and the research design for accomplishing the objective are the same or closely related to another proposal or award, regardless of the funding source." PD, at Section 7.

CSO for R&D efforts primarily in conjunction with the Agencies' Other Transaction authority pursuant to 10 U.S.C. § 2371b.[3]  Its goal is mirroring private sector contracting and investment practices.  U.S. Gov't Accountability Off., GAO-17-644, *Military Acquisitions: DOD Is Taking Steps to Address Challenges Faced by Certain Companies* 27-28 (2017), *available at* https://www.gao.gov/assets/gao-17-644.pdf; Defense Innovation Unit Experimental, *DIUx How-to- Guide* 6-7.  Where in a traditional procurement, the Government defines its requirement with a set of specifications, releases a solicitation, and receives and evaluates proposals, and selects an appropriate contractor to perform the needed work, in a CSO, the Federal agency describes a broad area of the DoD's interest, and then selects proposed solutions after a peer review by technical experts.  DIUx, *Guide* at 10-11; GAO-17-644, *Military Acquisitions*, 27-28.  The CSO procedures are considered competitive procedures under 10 U.S.C. § 2304.

Later, in 2016, Congress permanently authorized and codified the DoD CSO pilot program's broad solicitation and peer review process for contacts, exempting CSO acquisitions from the standard 10 U.S.C. § 2304 competition requirements.  *Compare* 10 U.S.C. § 2371b(f)(5) (Other Transaction Authority allows that "[c]ontracts and transactions entered into pursuant to this subsection may be awarded using the authority in subsection (a), under the authority of chapter 137 of this title, or *under such procedures, terms, and conditions as the Secretary of Defense may establish by regulation*.") (emphasis added) *with* 2017 NDAA, § 879(b) ("Use of general solicitation competitive procedures for the [CSO pilot program] shall be considered to be use of competitive procedures for purposes of chapter 137 of title 10, United States Code.").  Congress also mandated that the DoD promulgate further guidance, resulting in

---

[3] Congress authorized the CSO technique on a pilot basis in section 879 of the National Defense Authorization Act (NDAA) for Fiscal Year (FY) 2017 (Pub. L. 114-328).

Protected Information To Be Disclosed Only In Accordance With The U.S. Court of Federal Claims Protective Order

the 2018 Off. of the Under Sec. of Def., 2018-O0016, Class Deviation – Defense Commercial Solutions Opening Pilot Program (June 26, 2018).[4]

      C.    <u>In-Space Servicing, Assembly and Manufacturing</u>

In-space servicing, assembly and manufacturing ISAM is a broad "suite of capabilities, which are used on orbit, on the surface of celestial bodies, and in transit between these regimes." Exec. Off. of the Pres., *In-Space Servicing, Assembly, and Manufacturing National Strategy* (2022), 6.[5]  ISAM enables specific space activities, as the term indicates.  Servicing includes in-space inspection, life extension, repair, or alteration of spacecraft after initial launch, including, visually acquiring, rendezvous and/or proximity operations, docking, berthing, relocation, refueling, upgrading, repositioning, undocking, unberthing, release and departure, reuse, orbit transport and transfer, and timely debris collection and removal.  *Id*.  Assembly describes "the construction of space systems in space using pre-manufactured components, products, or infrastructure in space."  *Id*.  Manufacturing includes the "transformation of raw or recycled materials into components, products, or infrastructure in space."  *Id*.  These capabilities may use technologies such as "robotics, sensors and software for trusted autonomy, re-entry/deorbit systems, advanced in space computing, verification and validation, standard interfaces, propulsion systems, systems engineering tools and techniques that support spacecraft serviceability, and low-cost reusable in-space mobility, logistics, and transportation systems."

---

[4]  Class Deviation 2018-O0016 is *available at* https://www.acq.osd.mil/dpap/policy/policyvault/USA001228-18-DPAP.pdf; *see also*, Air Force Federal Acquisition Regulation Supplement (AFFARS), 48 C.F.R. Subpart 5312.90, Pilot Program for Defense Commercial Solutions Opening, which incorporates the DAF Contract Policy Memo 18-C-03, Defense Commercial Solutions Opening Pilot Program Launch (September 2, 2018).

[5]  The National Science and Technology Council's In-Space Servicing, Assembly, Manufacturing Interagency Working Group's Strategy is available online at https://www.whitehouse.gov/wp-content/uploads/2022/04/04-2022-ISAM-National-Strategy-Final.pdf

7

Protected Information To Be Disclosed Only In Accordance With The U.S. Court of Federal Claims Protective Order

*Id.*   Additionally, this strategy defined the national strategic goal of "advance ISAM research and development" and "accelerate the emerging ISAM commercial industry," with actions such as create defined paths for early stage in-space evaluation and demonstration of ISAM technologies and ensure availability for a broad range of researchers. . .." *Id.*

Additionally, beginning in late 2021, SpaceWERX[6] and AFWERX, both affiliated with the Air Force Research Laboratory (AFRL or Air Force) and the Air Force SBIR Program, launched the "Orbital Prime" initiative where these program offices engage with industry to leverage the space technology sectors to further the Space Force's capabilities to advance the national defense.[7]   On behalf of the Space Force, AFRL described the objective of this Orbital Prime direct to Phase 2 (D2P2) topic as explor[ing] Innovative Defense-Related Dual-Purpose Technologies relating to the mission of In-space Servicing Assembly and Manufacturing ISAM. Pl. Mot., Ex. B, 57.   The program office sought as deliverables of evidence of technical feasibility and a validated prototype relevant to ISAM by requiring the small business concerns to submit technical descriptions of their prototype systems along with any pertinent diagrams or graphics and how these prototypes enable ISAM missions.   Pl. Mot., Ex. B, 34-35.

II.   The Air Force's Commercial Solutions Opening (CSO), Contemplated Many Separate and Independent Procurements Of Research and Development

Beginning on October 25, 2022, the Air Force began accepting proposals under the "Small Business Innovation Research Program Commercial Solutions Opening Direct-To-Phase-

---

[6] SpaceWERX, a U.S. Space Force arm of AFWerx "will play a role in pursuing innovative technologies for the U.S. Space Force."   Available at: https://www.afrl.af.mil/News/Article/2746302/spacewerx-ready-to-propel-space-innovation/.

[7] https://spacewerx.us/space-prime/

II X23.4" (the "Solicitation")[8].  *See* Commercial Solutions Opening (CSO), Pl. Mot., Ex. B.  In general, the Air Force solicited proposals to conduct research and development on and prototype delivery of an offeror-proposed new solution to one of the problem-sets, or topics that the Air Force identified in the CSO.

Here, the CSO contemplated multiple procurements "to create new [Air Force] solutions or potential new capabilities."  Solicitation, Pl. Mot., Ex. B at 7.  For example, the Solicitation identified two topics that offerors, like PredictivIQ, could choose from to propose a solution and seek an award:  (1) Topic AFX234-DCSO1 – "Orbital Prime ISAM: In-Space Servicing Assembly and Manufacturing Direct-To-Phase II SBIR" (Orbital Prime Topic) and (2) Topic AFX234-DCSO2 – Direct-to-Phase-II Call for Innovative Defense-Related Dual-Purpose Technologies/Solutions with a Clear Air Force Stakeholder Need (Open Topic).  CSO, Pl. Mot., Ex. B at 57-60.  For the Orbital Prime Topic, the overarching objective was to receive proposals that could, in their own way, effectively "explore Innovative Defense-Related Dual-Purpose Technologies relating to the mission of In-space Servicing Assembly and Manufacturing (ISAM)" and "to grow the Space Force's industrial base."  *Id.* at 57.  The CSO also instructed offerors to request the amount of funding that needed for their proposed work.  For Orbital Prime Topic proposals, the CSO set a $1.7M limit on the funding for each award.  *Id.* at 58.

The CSO "anticipate[d] approximately 104" in total among each of the various procurement.  *Id.* at 22.  The CSO did not indicate that the Air Force would make 104 awards

---

[8]  Plaintiff describes this solicitation as "AFX234-DCSO1."  *See, e.g.,* Pl. Memo at 2, 17. Elsewhere, PredictiveIQ asserts that the solicitation is the Commercial Solutions Opening (CSO) Direct-To-Phase-II X23.4.  Compl. at ¶1.  For clarity, "AFX234-DCSO1" is the Air Force Number for one topic under the CSO, the Orbital Prime Topic, but not all the topics solicited for research and prototype delivery under the CSO, Direct-To-Phase-II X23.4.

under the Orbital Prime Topic.  *See generally id.*  The CSO did, however, notify offerors that the

Air Force "reserve[d] the right to make no awards."  *Id*. at 22.

The CSO notified offerors that the Air Force engineers and scientists would peer review

proposals on their own merit as a separate and distinct R&D efforts.[9]  *See* CSO, Pl. Mot., Ex. B

at 49.  In particular, the CSO indicated:

> Proposals will be evaluated on a competitive basis. Proposals will initially be
> screened to determine responsiveness. Proposals passing this initial screening will
> be peer reviewed by engineers or scientists to determine the most promising
> technical and scientific approaches. **Each proposal will be judged on its own
> merits**. An offeror may submit, and subsequently receive awards for, multiple
> D2P2 proposals under a single solicitation provided the successful proposals do
> not contain essentially equivalent work. The [Air Force] is under no obligation to
> fund a specific number of Phase II proposals and may elect to award none.

*Id.* (emphasis added), (quoting the required language from the SBA PD, at Appendix I and

AFFARS 5312.90.).  The CSO also notified offerors that the peer reviews would be based on

three technical factors: (1) commercialization, (2) defense need, and (3) technical approach.  *Id.*

at 49-50.  Once the Air Force evaluated each proposal's technical aspects, the Air Force ranked

each proposal based on their individual rating to determine which would be selected for the

available funds.  Pl. Mot., Ex. B at 50. Funds availability is a factor that an agency issuing a

Commercial Solutions Opening (like this Solicitation) must consider.  *See* Defense Commercial

Solutions Opening Class Deviation 2022-O0007, 2.  ("The primary evaluation factors for

selecting proposals for award shall be technical, importance to agency programs, and funds

availability.").

---

[9]  Consistent with AFFARS 5312.90 and 10 U.S.C. § 4022 (formerly 10 U.S.C. §2371b), as
interpreted on p. 34 of the DoD Other Transactions Guide (November 2018), available online at:
https://www.dau.edu/pdfviewer/Source/Guidebooks/Other-Transactions-(OT)-Guide.pdf, the Air
Force also reserved the right to award Other Transaction authority agreements under the
Solicitation as an alternative to awarding procurement contracts.  Solicitation, Pl. Mot., Ex. B at
7.  However, all Air Force awards under this CSO were in fact procurement contracts.

A.     PredicitveIQ's Proposal In Response To The Commercial Solutions Opening (CSO), AFX234-DCS01, The Orbital Prime Topic

On November 20, 2022, Front End Analytics, LLC, PredictiveIQ's predecessor, submitted a proposal in response to the CSO's Orbital Prime Topic, No. AFX234-DCSO1. [10] *See* Front End Analytics, LLC's Proposal, Proposal, Appx335-436. Neither PredictiveIQ nor Front End Analytics, LLC submitted a proposal in response to the other CSO, *i.e.*, the Open Topic.

Front End Analytics proposal requested $1,699,982.36 in funding—just below the $1.7M limit for Orbital Prime awards—to provide research and prototype delivery on "Physics Informed Machine Learning for Improved Maneuverability to Support In-Space Servicing, Assembly, & Manufacturing" Proposed Solution. Appx361.

B.     Air Force Evaluated PredictiveIQ's Proposal On Its Own Merit Without Considering Other Proposed Topic Solutions

In response to the Orbital Prime Topic, the Air Force received ▮ proposals submitted on or before the November 22, 2022 submission deadline. *See* Contracting Officer's Memo for Record, Appx498. After rating each of the proposal's technical solutions based on their individual merit, the Air Force then ranked each proposal to determine which were selected based on available funding. *Id.* The Air Force selected for funding 30 offerors (▮

---

[10] The "Proposal" that Plaintiff claims to have submitted identified the name of the offeror as "Front End Analytics, LLC." The Air Force understands that Plaintiff claims to be the successor-in-interest of Front End Analytics, LLC based on the Plaintiff's allegations included in its protest filed at, and currently pending before, the GAO under protest number B-421436.2. Specifically, Plaintiff alleges that Front End Analytics, LLC changed its name to PredictiveIQ LLC on November 23, 2022. Appx476-493. Although the United States does not currently dispute the Plaintiff's assertion it is in fact the successor-in-interest based on Plaintiff's documentation showing its name change dated November 23, 2022 (over five months after the alleged name change) the System of Award Management ("SAM") account, DUNS, and the SBA SBC Identification Number identified in or associated with the Proposal still identify "Front End Analytics, LLC" as the holder of such accounts and certifications. *See* CSO "Common Disqualifiers" Pl. Mot. Ex. B at 47.

█) for the Orbital Prime Topic.[11]  Brewer Decl.¶9. ████████████████████

████████████ on January 20, 2023, the Air Force notified PredictiveIQ that the Air Force

did not select its proposal for funding. *Id.* ¶10; *see* First Notice of Selection Status, Pl.  Mot. Ex.

D.

### C.    Procedural History

On January 20, 2023, PredictiveIQ protested this decision at the Government

Accountability Officer (GAO).  On February 8. 2023, the Air Force took corrective action, and

the GAO dismissed the protest. *See PredictiveIQ LLC*, B-421436.1.  Subsequently, on March

22, 2023, after re-evaluating PredictiveIQ's proposal, the Air Force confirmed its decision not to

select PredictiveIQ's proposed solution for funding and notified them. *See* Second Notice of

Selection Status, Pl.  Mot. Ex. D.  In fact, the Air Force assessed PredictiveIQ's proposal less

favorably on each of the technical criterion. *Compare* First Proposal Feedback, Pl. Mot. Ex. C

(Commercialization was rated ████, defense need was rated ████████, and technical merit was

rated ████████) *with* Second Proposal Feedback, Pl. Mot. Ex. E (Commercialization was rated

████████ defense need was rated ████████, and technical merit was rated ████████).

On April 3, Plaintiff filed its second protest of the Air Force's decision "to not select

PredictiveIQ for award under Commercial Solutions Opening Direct-To-Phase-II X23.4, as

amended." *See PredictiveIQ LLC*, B-421436.2 (the "Protest").[13]  This protest remains pending

---

[11]  The ████████████ proposals selected requested funding amounts of $1,698,006.35
and $1,698,040.80, respectively.

[12]  Of the 145 proposals submitted, 137 of them were evaluated.

[13]  PredictiveIQ challenges (1) the Air Force's evaluation of its proposal during corrective
action because the Air Force's corrective action evaluation resulted in a lower assessment than
the first evaluation; (2) the Air Force's evaluation of the commercialization criteria; (3) the Air
Force's evaluation of its defense needs criteria; and (4) the Air Force's overall best value
decision.

before the GAO.  Pursuant to the GAO's 100-day protest resolution rule, GAO should rule on the Protest on or before July 12, 2023.

      D.      Air Force Voluntary Stayed Funding Agreements Awarded For The Orbital Prime Topic Out Of An Abundance Of Caution

Within PredictiveIQ's April 3, 2023 GAO protest, it demanded that the Air Force stay performance pursuant to 31 U.S.C. § 3553, the Competition in Contracting Act ("CICA").  *See PredictiveIQ, LLC*, B-421436.2, at 1.  On April 4, 2023, PredictiveIQ's counsel contacted the agency counsel seeking "confirm[ation] that the Agency has implemented the CICA stay and that it has informed any awardees Commercial Solution Opening AFX234-DCSO1[, *i.e.*, the Orbital Prime Topic,] that they must stop performance and suspend any related activities while this protest is pending."  Pl. Counsel April 4 Email, Appx505.  Because the protest involved this SBIR CSO which resulted in multiple procurements—unlike a traditional procurement of a single requirement, within solicitations—the contracting officer in charge of this CSO consulted with legal advisors to determine the applicability and the extent, if at all, of the CICA automatic stay provisions to the other procurements completed under the CSO.  *See* Contracting Officer's Memo for Record, Appx496-98.

Without resolving whether the CICA automatic stay extended to all of the funding agreements under this CSO, on Friday, April 7, 2023, after initial consultation with legal advisors, the contracting officer undertook stop-work orders, on a voluntary basis, for each of the 30 Orbital Prime Topic (i.e., AFX234-DCSO1) awarded funding agreements.  *Id.* at 2. Accordingly, on April 7, 2023, agency counsel notified PredictiveIQ's counsel on that same Friday that "[t]he Air Force has stayed the contracts awarded under Commercial Solution Opening AFX234-DCSO1."  AF Counsel Email, Pl. Mot. Ex. A.

E. **The Air Force Determined The Automatic Stay Provision Of The Competition In Contracting Act Does Not Extend To All Funding Agreements Resulting From This Commercial Solutions Opening**

On the following Monday, April 10, and after further review, the Air Force determined that the CICA automatic stay's prohibition against awarding contracts after being notified of a bid protest did not extend to the other Orbital Prime Topic awarded funding agreements. *See* Contracting Officer's Memo for Record, Appx495. The Air Force came to this understanding because, among other reasons, those other awards are different procurements and, thus, such awards are not "with respect to such procurement" (31 U.S.C. § 3553(c)(1)) that PredictiveIQ protested. *See id.*

Having issued the April 7, 2023 stop work orders, and despite the Air Force view that the CICA automatic stay provision did not requiring a stay of the other 30 Orbital Prime Topic awards, on April 10, 2023, the Air Force decided to lift the stop-work orders issued to the top 28 Orbital Prime awardees' funding agreements. At the same time, the Air Force decided to maintain the stop-work orders issued to awarded funding agreements ███████████████████ . *Id.* at 3. The Air Force's actions maintained the *status quo* on the Orbital Prime Topic funds available to consider PredictiveIQ's proposal, if needed, even though the Air Force may also obtain additional funding. *Id.* Specifically, maintaining a voluntary stay on the ███████████ ████ funding agreements would permit the Air Force to award the funding amount PredictiveIQ requested should it prevail in its protest on the merits at the GAO, and then, if it became an awardee. *Id.*

Before the Air Force took any action on the stop-work orders, the Air Force's counsel notified Plaintiff's counsel on 12 April "that while the Air Force initially stayed all awards made under CSO AFX234-DCSO1, the Air Force is now lifting the stay on certain awards that would not affect, or would not be affected by, a scenario in which PredictiveIQ's proposal would be

14

awarded. Nevertheless, the Air Force is maintaining the stay placed on the contracts awarded

under CSO AFX234-DCSO1 whose funding could affect, or could be affected by, such a

scenario. The Air Force is staying those contracts to maintain the *status quo* pending

PredictiveIQ's protest."  AF Counsel Email, Pl. Mot. Ex. A.  Two days later, on 14 April, the Air

Force notified 28 of the 30 Orbital Prime Topic awardees that the Air Force rescinded the stop-

work orders placed on their contracts. *See* Contracting Officer's Memo for Record, Appx495.

Additionally, the contracting officer finally determined, that the automatic stay provisions of

CICA, 31 U.S.C. § 3553 do not apply to all of the contracts awarded under this CSO.  The head

of the contracting authority reviewed the information contained within this decision document,

and concurred.  Moreover, the head of the contracting activity also determined that regardless, it

was in the best interest of the Air Force to let the remaining contractors continuing their research

and development efforts.  Contracting Officer's Memo for Record, Appx502.

LEGAL STANDARDS

I.     Motion To Dismiss

"Jurisdiction is a threshold issue, and a court must satisfy itself that it has jurisdiction to

hear and decide a case before proceeding to the merits." *Ultra-Precision Mfg., Ltd. v. Ford

Motor Co.*, 338 F.3d 1353, 1356 (Fed. Cir. 2003) (citing *PIN/NIP, Inc. v. Platte Chem. Co.*, 304

F.3d 1235, 1241 (Fed. Cir. 2002) (internal quotation marks omitted).  If the Court does not

possess subject-matter jurisdiction over the plaintiff's claim, the case should proceed no further.

*Central Freight Lines v. United States*, 87 Fed. Cl. 104, 107 (2009).  When deciding a motion to

dismiss based upon lack of subject matter jurisdiction, "the allegations of the complaint must be

construed favorably to the plaintiff." *Armour of Am. v. United States*, 69 Fed. Cl. 587, 590

(2006).  Nonetheless, plaintiff bears the burden of establishing jurisdiction. *See id*. (citing *Taylor

v. United States*, 303 F.3d 1357, 1359 (Fed. Cir. 2002); *Reynolds v. Army & Air Force Exch.*

15

*Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)). "Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997) (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 9-10 (1983)).

II.     Legal Standards for a Preliminary Injunction

A preliminary injunction is a "drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). *Accord Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (Fed. Cir. 2018). Because the grant of an injunction is "extraordinary relief," the Court applies "exacting standards." *Lermer Germany GmbH v. Lermer Corp.*, 94 F.3d 1575, 1577 (Fed. Cir. 1996). Injunctive relief "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

"The function of preliminary injunctive relief is to preserve the status quo pending a determination of the action on the merits." *Litton Sys., Inc. v. Sundstrand Corp.*, 750 F.2d 952, 961 (Fed. Cir. 1984); *see also IBM v. United States*, 118 Fed. Cl. 677 (2014) (denying injunctive relief where granting the protestor's "request would actually upset, rather than preserve, the status quo"). "Plaintiff bears the burden of proving it is entitled to preliminary injunctive relief by clear and convincing evidence." *Filtration Dev. Co. v. United States*, 63 Fed. Cl. 418, 423 (2005) (citation omitted); *see also MCS Mgmt., Inc. v. United States*, 48 Fed. Cl. 506, 511 (2001).

To obtain a preliminary injunction, a protester bears the burden of establishing: "(1) that [it] is likely to succeed on the merits at trial; (2) that it will suffer irreparable harm if preliminary relief is not granted; (3) that the balance of the hardships tips in the [protestor's] favor; and

(4) that a preliminary injunction will not be contrary to the public interest." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *see also PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004); *OAO Corp. v. United States,* 49 Fed. Cl. 478, 480 (2001) ("When deciding if a TRO is appropriate in a particular case, a court uses the same four-part test applied to motions for a preliminary injunction." (citation omitted)).

Failure to meet the criteria of any one factor may require denial of the request for a preliminary relief. *FMC Corp.*, 3 F.3d at 427 ("If the [preliminary] injunction is denied, the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned to the other factors, to justify the denial." (citation omitted)). In fact, the Federal Circuit has clarified that a plaintiff *cannot* be granted a preliminary injunction "unless it establishes *both* of the first two factors, i.e., likelihood of success on the merits and irreparable harm." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (emphasis in original) (citation omitted); *see also RhinoCorps Ltd. Co. v. United States*, 87 Fed. Cl. 261, 273 n.14 (2010).

ARGUMENT

I.  PredictiveIQ Lacks Standing Because It Is Not An Interested Party To Other Small Businesses's Contracts

The complaint must be dismissed as PredictiveIQ lacks standing, and therefore the Court lacks jurisdiction under 28 U.S.C. § 1491(b)(1). PredictiveIQ lacks standing because its proposal does not have a substantial chance at award, and litigation, either here or at the GAO, cannot non-speculatively place it within consideration of a funding agreement award. *United States v. IBM Corp.*, 892 F.2d 1006, 1011-12 (Fed. Cir. 1989).

For bid protests, standing "is framed by 28 U.S.C. § 1491(b)(1), which . . . imposes more stringent standing requirements than Article III." *Weeks Marine, Inc. v. United States*, 575 F.3d

17

1352, 1359 (Fed. Cir. 2009). To have standing under 28 U.S.C § 1491(b), a litigant must be an "interested party." 28 U.S.C. § 1491(b)(1). The Tucker Act refers to an "interested party," but does not define that term. *See id.* As such, "[t]he term 'interested party' in section 1491(b)(1) is construed in accordance with CICA, 31 U.S.C. §§ 3551-56," and therefore refers to "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 1996) (quotation omitted). "Thus, to come within the Court of Federal Claims's § 1491(b)(1) bid protest jurisdiction, [a protester] is required to establish that it (1) is an actual or prospective bidder and (2) possesses the requisite direct economic interest." *Weeks Marine*, 575 F.3d at 1359 (quotation and modification notation omitted). In the bid protest context, that includes demonstrating that a protestor has a substantial chance at award. *Eskridge & Assocs. v. United States*, 955 F.3d 1339, 1344-45 (Fed. Cir. 2020) (upholding the Court of Federal Claims dismissal of a post-award bid protest where the protestor could not show it had a substantial chance at award where there were three lower-priced technically acceptable bids with a higher chance at award.)

PredictiveIQ is not an interested party in *all* of the awards as discussed more below, and Predictive does not have a substantial chance of award under the CSO. Therefore, its Complaint must be dismissed.

A.  Predicitive IQ Is Not An Interested Party As Defined in 31 U.S.C. § 3551

PredictiveIQ defined its objection to the CSO at the GAO as Air Force Solicitation No. Commercial Solutions Opening AFX234-DCS-01, the Orbital Prime Topic. Appx476.Therefore, it is objecting to the awards under this topic, which eliminates any purported challenge to *all* awards under the Agency's Commercial Solutions Opening Direct-To-Phase-IIX23.4 ('Solicitation')" (Compl., ¶1), but the inquiry does not end there. Interested party for jurisdiction

18

in this Court is defined by CICA, 31 U.S.C. §§ 3551-56 (*Rex Serv. Corp*, 448 F.3d at 1307) and as another judge of this Court's reasoning concludes, determining interested party status is dependent upon the nature of the objection. *AeroSpray, Inc. v. United States*, 156 Fed. Cl. 548, 565 (2021) ("The phrase with respect to a contract or a solicitation or other request for offers described in paragraph (1) … provides a meaningful textual clue of . . . whether [the protester] was an actual offeror 'with respect to a contract' award that is the subject of the objection. *Id*. § 3551(1)-(2).")

In *AeroSpray Inc. v. United States*, this Court addressed a protester's challenge to other contractors' awards the government granted under a solicitation. To determine whether the plaintiff protester was an "interested party" to challenge those other awards, the Court stated that "the question here, thus, is not whether [the protester] is (or, more accurately, was) an 'an actual . . . offeror' generally for the procurement at issue, but rather whether [the protester] was an actual offeror 'with respect to a contract' award that is the subject of the objection. Id. § 3551(1)-(2)." Accordingly, the Court found that the protester was not an "interested party" and, thus lacked standing, because it "was not, and is not, an actual offeror 'with respect to' the other contract awards to which [the protester] now objects. … [the protester] is not an actual offeror for the other awarded contracts."

Similarly, here, PredictiveIQ is not an "interested party" because it was not an "actual offeror" for the other awarded contracts it now seeks to stay because those other contracts were part of separate procurements. The CSO, a general solicitation, contemplated numerous resulting procurements, and corresponding numerous resulting contracts. CSO, Pl. Mot., Ex. B at 49. ("Each proposal will be judged on its own merits. An offeror may submit, and subsequently receive awards for, multiple D2P2 proposals under a single solicitation provided

19

the successful proposals do not contain essentially equivalent work.")  Indeed, small business

concerns could have submitted for multiple awards representing different efforts or solutions to

the Air Force's CSO, so long as the proposed efforts were not essentially equivalent in nature.

*See*, *e.g.*, CSO, Pl. Mot., Ex B, 9, 18, and 48. ("Note that companies may submit multiple

proposals, and receive multiple awards, to topics under this solicitation, so long as the proposed

work is not essentially equivalent in nature.").  Therefore, logically, the resulting awards were

different contracts regardless of the putative awardees.

      B.     PredictiveIQ Does Not Have A Direct Economic Interest In The SBIR D2P2
               Awarded Funding Agreements

      PredictiveIQ lacks a direct economic interest, because even through litigation at the GAO

or in this Court, it cannot supplant the numerous proposals in front of them for award in front of

it using the Air Force's first evaluation.  Brewer Decl ¶10.  The Air Force several proposals ahead

of PredictiveIQ on technical merit, defense need and commercialization.  In *Eskridge*, the Court

of Appeals has upheld the Court of Federal Claims dismissal of a post-award bid protest where

the protestor lacked a substantial chance at award, and therefore, a direct economic interest in the

challenged procurement, because, even if it successfully challenged the award, other similarly

rated, lower-priced proposals were more likely to get the contract.  *Eskridge*, 955 F.3d, 1344-45.

Similar to the protestor in *Eskridge*, PredictiveIQ's assigned errors, even if successfully

challenged in this litigation, will not likely upend numerous evaluations.  *See also*, *Zeidman*

*Technologies v. United States* 144 Fed. Cl. 294, 299 (2019) (Dismissing a case awarded under

the SBIR Program because the "[plaintiff] fail[ed] to address the applicable standard. . . . and

with six proposals ranked above plaintiff's, the court cannot assume that even a generically

improved score would put plaintiff in contention for award.  Plaintiff establishes, at most, the

'bare possibility' of an award.").

II.     PredictiveIQ Is Not Likely To Succeed On The Merits Because This CSO Contemplated
        Numerous, Separate Contracts

PredictiveIQ moves the Court to order the Air Force to "stay performance of all awards
made pursuant to Commercial Solution Opening AFX234-DCSO1 while PredictiveIQ's GAO
Protest related to the Solicitation is pending." Pl. Mot. at 1. PredictiveIQ argues that a
preliminary injunction is warranted, asserting (as it must prove) that it is likely to succeed on the
merits. Pl. Memo. at 7-14. Specifically, PredictiveIQ contends it can show that the "Air Force
violated the statutory requirements of CICA because (1) CICA applies to the *contract,* and (2)
the Air Force is not complying with CICA's automatic stay requirements." *Id.* at 8 (emphasis
added).

But the Air Force's position is a narrow one, specifically "[t]he Air Force does not view
the **CICA stay provision** as applicable to these awards . . .." *Id.* at 12 (quoting Pl. Mot. Ex. A,
C. Robertson Email to K. Barnett, RE: Pre-Filing Notice of Action to Enforce CICA Stay in a
Bid Protest (Apr. 12, 2023)). Accordingly, the actual issue for the Court to determine on the
merits is whether the CICA stay provisions apply to other contracts when the Air Force awarded
them under separate procurements from the one that PredictiveIQ protests. For the reasons
discussed below, it is unlikely that PredictiveIQ would succeed on the merits.

        A.      The Automatic Stay Provisions of CICA Do Not Require The Air Force To Stay
                The Award Or Performance Of Contracts Which Resulted From Procurements
                Other Than The Protested Procurement

As PredictiveIQ concedes, the CICA stay provision is not limitless. *Id.* at 8 ("CICA's
automatic stay is not absolute"); *see also* 31 U.S.C. § 3553. It does not require each agency to
stay the award or performance of each and every procurement the Government makes; otherwise,
the entire Federal acquisition process would grind to a halt each time a contractor files a protest.

*See generally id.* Rather, the stay applies only to the specific procurement at issue – and here, there were many.

Section 3553(c)(1) of Title 31—the CICA stay provision involving contracts not yet awarded—provides that "a contract may not be awarded in any procurement after the Federal agency has received notice of a protest with respect to **such** procurement . . .." (Emphasis added.) Section (c)(1) does not prohibit an agency from awarding contracts with respect to procurements that are not the subject of the protest. *See generally* 31 U.S.C. 3553(c)(1). Section 3553(d)(i)-(ii) of Title 31—the CICA stay provision involving contracts already awarded and performance underway—provides that "the contracting officer may not authorize performance of **the contract** to begin while the protest is pending," or if performance was underway, "the contracting officer shall immediately direct the contractor to cease performance under the contract." Those sections of the CICA stay provision also do not prohibit an agency from awarding contracts with respect to other procurements that are not the subject of the protest. *See generally* 31 U.S.C. 3553(d)(i)-(ii). Accordingly, the CICA stay provisions do not require agencies, such as the Air Force, to stay every procurement effort when a protest to a separate procurement is filed, regardless of their relation.

B.    A Procurement Subject To A Stay Is The One Pertaining To The Particular Government Need At Issue

A single solicitation may include multiple procurements. *See e.g., D&J Enter. V. United States*, 159 Fed. Cl. 808, 811 (Fed. Cl. 2022) (stating that the agency "conducted two separate procurements under the solicitation-an unrestricted competition allowing full and open competition and a competition restricted to small businesses"). Title 41 of the U.S. Code governing Public Contracts defines a "procurement" as "includ[ing] all stages of the process of acquiring property or services, beginning with the process for determining **a need for property**

22

**or services** and ending with contract completion and closeout." 41 U.S.C. § 111; *see also Distributed Sols., Inc. v. U.S.*, 539 F.3d 1340, 1345-46 (Fed. Cir. 2008) (emphasis added).

For traditional solicitations, the Government's procurement "need" or requirement solicited is typically unique and indicated in a solicited design or performance specification for existing goods or services. SBIR solicitations, on the other hand, involve multiple "needs" for procurement. *See Squire Sols., Inc.,* B-419477.2, June 10, 2021, 2021 CPD ¶ 229 at 5 (stating a "SBIR procurement, which is not based on design or performance specifications for existing equipment, but rather emphasizes scientific and technological innovation and has as its objective the development of new technology").

The Small Business Administration's SBIR/STTR Policy Direction, which establishes the baseline requirements for the administration of each agency's SBIR program, makes clear that a single SBIR solicitation may seek to address multiple "needs" and defines a SBIR Program Solicitation as "**A formal solicitation** for proposals issued by a Federal Agency that notifies the small business community of **its R/R&D needs** and interests in broad and selected areas, as appropriate to the agency, and requests for proposals from [small business concerns] in response to **these needs** and interests." SBA SBIR/STTR Policy Directive, Oct. 1, 2020, at 10 (available at https://www.sbir.

gov/sites/default/files/SBA_SBIR_STTR_POLICY_DIRECTIVE_OCT_2020_0.pdf (emphasis added) (cited and incorporated by reference into the CSO at 7). In other words, a SBIR Program Solicitation involves a single "solicitation" requesting proposals to address multiple agency research and development "needs." *Id.* The SBIR/STTR Policy Direction even provides that "[a]gencies may decide to issue joint solicitations." *Id.* at 31.

23

This multi-needs, multi-procurement element of a SBIR solicitation is critical to serving some of the statutory[14] purposes of the SBIR program, which includes to "stimulate technological innovation." *Id.* at 2. Because soliciting for "innovation" necessarily involves "[s]omething new or improved," an agency must be able to identify in SBIR solicitations broad areas of interest for research and development without restricting potential offerors to single-need, single-procurement effort." *Id.* at 10. Such a restriction would discourage the diversity of ideas, frustrate the statutory purpose, including innovation of technology, and reduce Government efficiencies. Thus, unsurprisingly, the single-solicitation, multi-procurement feature of the SBIR program and CSO method is specifically Congressionally authorized, and even appears in the Federal Acquisition Regulation. As PredictiveIQ duly notes in its Memorandum (Pl. Memo. At 10), FAR 3.104-1 defines "Federal agency procurement" as including "[f]or broad agency announcements and small business innovation research programs, **each proposal received by an agency constitutes a separate procurement** for purposes of 41 U.S.C. chapter 21." Accordingly, because a SBIR solicitation may seek to address multiple "R/R&D needs" and requirements, a SBIR solicitation may contemplate multiple "procurements" as defined under 41 U.S.C. § 111.

    C.    <u>The SBIR CSO At Issue Contemplated Multiple Procurements</u>

This Court has held that the "SBIR program gives the participating agencies broad discretion in administering the program." *Squire Solutions, Inc. v. United States*, 156 Fed. Cl. 249, 269 (2021). "Under the SBIR program's broad discretion, agencies have unfettered ability to avoid the constraints of a bid protest" and "control over how [they] construct[] [their] solicitations." *Id.* at 263, 269.

---

[14] The Small Business Innovation Research Program was established by the Small Business Innovation Development Act of 1982, P.L. 97-219 (15 U.S.C. § 631 et seq.).

Here, the Air Force constructed the SBIR CSO, contemplating multiple procurements to satisfy multiple needs. The SBIR CSO informed offerors about the numerous lines of effort solicited and that "[a]wards will provide funds to conduct further RDT&E for non-Defense commercial solutions **to meet specific [Air Force] end-users' and customers' needs**," plural. CSO at 27. Under the CSO Orbital Prime topic, AFX234-DCSO1—under which PredictiveIQ moves to preliminarily enjoin the Air Force to stay all awards—the Air Force sought proposals "to explore Innovative Defense-Related Dual-Purpose Technologies relating to the mission of In-space Servicing Assembly and Manufacturing" or "ISAM." CSO at 58. As the ISAM name indicates, this broad area of interest includes several different problem sets, including innovations for (1) in-orbit servicing, (2) in-orbit assembly, and (3) in-orbit manufacturing. *Id.* In this regard, the CSO contemplated scenarios in which one offeror may propose an innovative solution to address an in-orbit serving need, while another might address an in-orbit assembly need. *See id.*

Most evident of the SBIR CSO's multi-need, multi-procurement approach is the stated "Defense Need" factor. CSO at 50. Instead of the Air Force restricting what offerors could propose to some stated ISAM need, the Air Force constructed the SBIR CSO to solicit idea from industry about what specific "Defense Need" each offeror's solution could fulfill. *Id.* Accordingly, the Air Force evaluated a wide variety of proposals offering solutions to address different, self-identified "Defense Needs," which the Air Force evaluated on each proposal's own merit based on, among other things, "[a]dequacy of the proposed effort and its relationship to fulfilling the identified Defense Need." *Id.*

Further indicating that the Air Force solicited multiple needs through this SBIR CSO, the SBIR CSO informed offerors that "[e]ach proposal will be judged on its own merits" and the

peer reviewers would base his or her "conclusions only on information contained in the proposals" he or she evaluated without comparing them to other proposals submitted. *Id.* at 49-50. Lastly, the SBIR CSO made clear that the Air Force was "under no obligation to fund a specific number of Phase II proposals and may elect to award none." *Id.* at 49. Put simply, the SBIR CSO treated each proposal separately to address different needs. As evident from the SBIR CSO's effort to address multiple needs and requirements, the Air Force constructed it so that each proposal submitted constituted a separate procurement and resulting contract.

The Air Force's interpretation that each SBIR proposal is separate procurement is not unheard of in other contexts, such as in regulating procurement integrity. For example, the Federal Acquisition Regulation (FAR) 48 C.F.R. § 3.104-1 defines "Federal agency procurement" as the "acquisition (by using competitive procedures and awarding a contract) of goods or services (including construction) from non-Federal sources by a Federal agency using appropriated funds. *For broad agency announcements and **small business innovation research programs**, **each proposal received by an agency constitutes a separate procurement*** for purposes of 41 U.S.C. chapter 21." (emphasis added).[15] Indeed, the Air Force provided cover sheet offerors' proposal references FAR 3.104, which PredictiveIQ attached to the top of its proposal. Appx335.

D.     The Automatic Stay Provisions Do Not Extend To Procurements Other Than The Procurement PredictiveIQ Protested

PredictiveIQ asks the Court to extend the reach of the CICA stay provisions to other procurements that are not "with respect to the procurement" PredictiveIQ protests at GAO. As

---

[15] DFARS Proposed Rule, *Defense Federal Acquisition Regulation Supplement: Defense Commercial Solutions Opening (DFARS Case 2022–D006)*, at 88 Fed. Reg. 6605 (January 31, 2023), would supplement the first sentence of FAR 3.104-1 definition of Federal agency procurement to add CSOs, but leave unaltered the second sentence of FAR 3.104-1, indicating that that each SBIR proposal constitutes a separate procurement.

discussed above, the text of the CICA stay provisions do not require the Air Force to stay awards or performance under other procurement efforts. For PredictiveIQ to claim that they do, such a claim would create absurd and significantly harmful impacts to every agency's ability to solicit and administer multiple lines of procurement effort addressing separate "**needs**" contemporaneously.

Here, the SBIR CSO solicited multiple needs through multiple procurements to address broad problem sets such as ISAM. *See* CSO, Pl. Mot. Ex. B, at 58. Consistent with the definition of a "procurement" under Title 41 of the U.S. Code and the SBIR/STTR Directive Policy's contemplation of the multi-need, multi-procurement solicitation, the Air Force constructed the SBIR CSO such that each proposal submitted constituted a separate procurement. Accordingly, as the Air Force informed PredictiveIQ before it filed the present action, "[t]he Air Force does not view the CICA stay provision as applicable to these awards" because they were made under separate procurements from the one that PredictiveIQ protests. Pl. Memo. at 12. Indeed, PredictiveIQ's action before GAO does not challenge any other procurement under the SBIR CSO. Instead, PredictiveIQ merely "protests the decision of the U.S. Department of the Air Force … to not select PredictiveIQ for award under [the SBIR CSO]." Appx476.

Finally, the statutory and regulatory intent of the CSO show that the Air Force may unilaterally decide what topics to consider, receive proposals, evaluate the proposals, and award SBIR contracts. This is discretion beyond "the triple whammy" of discretion typically afforded the agency officials in traditional procurements. *Ginn Grp., Inc. v. United States*, 159 Fed. Cl. 593, 601. (2022). Indeed, this Court defers to the agency when considering CSOs. *Kinnemetrics v. United States*, 155 Fed. Cl. 777, 788 (2021) (dismissing the post award bid protest for failure to state a claim upon consent of the parties absent the certified administrative record after

reviewing whether the Air Force followed the CSO terms). Thus, PredictiveIQ has not established that it will succeed on the merits. *See generally EH Group,* B-419946.2 (March 25, 2022) (denied a post-award SBIR contract bid protest because it found the Air Force's proposal selection process and documentation reasonable, transparent, and unobjectionable.)

For all of these reasons, it is unlikely that PredictiveIQ will succeed on the merits in this action.

### III. PredictiveIQ Has Failed To Establish That It Will Be Irreparably Harmed Before Its GAO Challenge Concludes

The irreparable injury requirement erects a very high bar for a movant. *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 334 (D.D.C. 2012). To obtain preliminary injunctive relief, it is not sufficient that a plaintiff demonstrates the mere "possibility" of irreparable injury; rather, it must "demonstrate that irreparable injury is *likely* in the absence of an injunction. *Winter*, 555 U.S. at 22. Thus, a "preliminary injunction will not issue simply to prevent a mere possibility of injury, even where prospective injury is great. A presently existing, actual threat must be shown." *Qingdao Taifa Grp. v. United States*, 581 F.3d 1375, 1379 (Fed. Cir. 2009) (quoting *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983)).

Generally, "an injury is not considered 'irreparable' if the only injury alleged is monetary loss." *Chapman Law Firm Co. v. United States*, 67 Fed. Cl. 188, 193 (2005). In other words, "economic loss alone does not constitute irreparable harm." *Id.* Moreover, "[m]ere allegations of an unfair competitive bidding process are not sufficient to demonstrate an irreparable injury," because "if they were, any bid protest would involve an irreparable injury." *OAO Corp. v. United States*, 49 Fed. Cl. 478, 480 (2001).

In short, PredictiveIQ must establish that without a preliminary injunction, it will suffer irreparable harm before a decision can be rendered on the merits. *Heritage of Am., LLC v. United States*, 77 Fed. Cl. 66, 78 (2007). But the two theories of irreparable harm advanced by PredictiveIQ—that it will suffer irreparable harm (1) because it will lose the ability to compete for an award and (2) because other SBIR funded awardees will have a head start developing its technology, and thus be competitively disadvantaged absent a broad stay—are not borne out by the record evidence. Pl. Mem., 11-15.

A. PredictiveIQ's Lost Opportunity Argument Fails

Relying on *PGBA, LLC v. United States (PGBA I)*, 57 Fed. Cl. 655, 664 (2003), PredictiveIQ argues that it will lose the ability to compete for an award and that other SBIR contractor gain a competitive advantage, a head start, over PredictiveIQ because of their selection under this CSO. Pl. Mem. at 11-12. PredictiveIQ's arguments are unpersuasive. Despite the Air Force's determination that the automatic stay does not apply to all of the contracts, because they are separate procurements, the Air Force has stayed two SBIR contracts to maintain the funding. This maintains the status quo, as discussed in *PGBA, LLC*. PredictiveIQ's lost opportunity argument is based upon the flawed, yet fundamental assumption that PredictiveIQ was competing for the same requirement as other small business concerns who proposed to this CSO, but that is not the case. In this CSO, the offerors are pursuing their own proposed R&D goals toward the broad objective—ISAM capabilities. Thus, PredictiveIQ has failed to establish that it has lost an opportunity to compete.

In any event, PredictiveIQ ignores the fact that, despite the Air Force's determination that the automatic stay provision of CICA does not apply to the numerous, separate contracts awarded under the CSO, the Air Force has voluntarily stayed the CSO awards

████. This action will preserve funding in the event that the Air Force elects to re-evaluate or award a different SBIR D2P2 funding agreement as a result of the GAO protest. The contracting officer and AFWERX Deputy Director of Financial Management/Comptroller reviewed the funding availability information contained within this decision document, and concurred that alternative funding is available from the DAF SBIR Program budget regardless of stay of the two contracts. Appx.502. Moreover, it is also not as if Predictive lost out on a five-year contract. Instead, the SBIR program regulations require Federal agencies to publish R&D topics annually,[16] and the Air Force has posted AFWERX topics for Winter and Spring D2P2 cycles for industry.[17]

### B. PredictiveIQ's Competitive Disadavantage Argument Is Speculative At Best

Arguing that it will be harmed by a competitive disadvantage relative to other SBIR awardees who are receiving government funding to further their research and development efforts, PredictiveIQ relies on the declaration of its CEO, Dr. Juan Butts. Pl. Mem. 12-15. Mr. Butts outlines the rapidly evolving fields of artificial intelligence and machine learning (AI/ML), noting that advances occur every day. Butts decl. ¶5. He explains PredictiveIQ's approach to control technologies and asserts that, in his view ████████████ overlap with PredictiveIQ's approach. Betts decl. ¶8. He also asserts that ████████████████ ████████████████, may be related to technologies that PredictiveIQ or others are developing. Butts decl. ¶10. In conclusion, the declaration asserts that the "[Air Force] is giving other companies a head start, thereby disadvantaging PredictiveIQ." Butts decl. ¶9.

---

[16] SBA PD, Section 5 ("At least annually, each agency must issue a Program Solicitation that sets forth a substantial number of R/R&D topics and subtopic areas consistent with stated agency needs or missions.").

[17] The Air Force's schedule is available at www.afwerx.com.

The very premise of Mr. Butts's conclusion, however, represents a mere disagreement with the agency's substantive technical conclusion, documented in the contracting officer's Memorandum for Record, that the R&D approaches are distinct from PredictiveIQ's.  Moreover, Dr. Butts' declaration also explains that AI/ML technology is ubiquitous, and breakthroughs in his field could happen daily.  *Id*. at ¶5-7.  Thus, the further premise that government funded research and development yields a competitive advantage to the level where its absence is irreparable is speculative at best and certainly does not establish irreparable harm – especially under the exacting standards required of such a showing.  *Lermer Germany GmbH*, 94 F.3d, 1577.

Accordingly, PredictiveIQ has failed to demonstrate irreparable harm in the absence of preliminary injunctive relief.

IV.    The Balance of Harms Outweighs Any Speculative Harm To PredictiveIQ

A.    The U.S. Air Force Would Be Harmed By An Injunction

If numerous SBIR Phase II funding agreements are enjoined, the United States will be deprived of leveraging the private sector's innovative research to further ISAM capabilities for the US Space Force or implement the objectives of the national ISAM strategy, including furthering the small business industrial base and the advancement of R&D in the field by multiple companies.  Moreover, the Air Force, like other Federal agencies' may be a less attractive business partner to industry, thus vitiating congressional intent to make contracting with the Federal government easier and more attractive to industry under the SBIR and CSO programs.  Indeed, the confluence of the SBIR program and the CSO procedures were intended to make contracting with the Federal agencies easier – and not subject to the protracted steps accompanying many traditional awards.

B.     Numient SBIR Phase II Awardees Would Be Harmed By An Injunction

PredictiveIQ requests that 30 Orbital Prime CSO awards be enjoined, and, arguably, that all (147) of the awards resulting from this CSO be enjoined, including the Air Force Open Topic, even though PredictiveIQ did not even propose to the Open Topic. *Compare* Pl. Memo at 2, 17 ("Commercial Solution Opening AFX234-DCSO1 ('Solicitation')") *with* Compl. at ¶1 (""Commercial Solutions Opening . . . X23.4"). In short, PredictiveIQ would have the Court halt as many as 147 SBIR contractors' research and development efforts, contractors whose interests are easily as important as PredictiveIQ's. More significantly, the Air Force has mitigated any potential harm by voluntarily staying two of the SBIR contractors to preserve funding while the GAO hears PredictiveIQ's protest on the merits. Additionally, one of the awardees has approached the contracting office indicating that the stop work order had impacted them as an awardee. Brewer Decl. ¶20. Indeed, many SBIR contractors could express similar concerns.

The Court's reasoning in *SEKRI, Inc. v. United States*, is instructive. In SEKRI, the Court declined to issue a preliminary injunction because the injury complained of—that Government funding obligated to the contract awardee was diverted from SEKRI wrongfully was harmful—did not rise to the level of irreparable injury. *SEKRI, Inc. v. United States*, Fed. Cl. No. 21-778, 2023 WL 1428644, *5 (Fed. Cl. Jan. 31, 2023). Here, PredictiveIQ alleges that other small businesses receiving Government funded research creates a competitive disadvantage, but the Air Force has maintained sufficient funding should it be required. Weighing the harms to the US Air Force and Space Force and perhaps, more importantly, to the numerous SBIR contractors currently performing with the speculative harm asserted by PredictiveIQ, any harm PredictiveIQ may suffer pales in comparison.

C.     A Preliminary Injunction Would Be Contrary To The Public Interest

Although we recognize that the public interest is served when the integrity of the procurement system is maintained, this factor cannot dominate the analysis of the public interest prong because that would create a presumption in favor of an injunction, which the Supreme Court rejected in *eBay*. *See MercExchange, L.L.C. v. eBay, Inc.*, 500 F. Supp. 2d 556, 586 (E.D. Va. 2007) ("while preserving the integrity of the patent system will always be a consideration in the public interest analysis, it cannot be allowed to dominate such analysis lest a presumption result"). Furthermore, this Court has held that it is in the public interest for "a procuring agency [to] be able to conduct procurements without excessive judicial infringement upon the agency's discretion." *Aero Corp., S.A. v. United States*, 38 Fed. Cl. 237, 242 (1997) (citation omitted). In particular, Congress has provided the the Federal agencies participating in the SBIR program unilateral authority to define the program areas of interest, evaluate proposals, and to make contract award decisions. 15 U.S.C. § 638(g). Moreover, as discussed above, the CSO enabling statute and regulations also empower the Air Force with broad discretion to employ soliciting procedures similar to the private sector like this CSO, and not the rigid system which has typically turned off the private sector.

The public interest is thus furthered by allowing all of these contractors to continue performing following the CSO's terms. Indeed, ISAM enables the preponderance of the capabilities for both the commercial and Defense space faring efforts. Leveraging current research developments from the commercial sector and future research and development ensures the Space Force's continued ability to operate in this domain. This is particularly important, at this time, as near peers, such as China, are rapidly increasing their competence in space-based

capabilities, including the increased launch of satellites (347 satellites) and recent use of a robotic arm that can "grab and crush vulnerable [space]craft from hostile nations."[18]

Moreover, the head of the contracting authority has reviewed the contracting actions of the Air Force, concurred in its determination that the automatic stay provisions of CICA do not extend to the independently awarded, separate contracts under the CSO.  Memorandum for Record, Appx 494-504.  Additionally, she decided that it is in the Air Force's interest to permit the other awardees to continue performance under 31 U.S.C. §3553(d*). Id. see*, *Supreme Foods GmbH v. United States*, 109 Fed. Cl. 369, 398 (2013) (refusing to issue a preliminary injunction but recognizing that the contracting agency could reaccomplish the CICA stay override at issue by identifying urgent and compelling services that were also in the agency's best interest.)

Since an injunction would be contrary to the public interest, and since the harms faced by numerous SBIR contractors and the Air Force, and the Space Force outweigh any potential harm faced by PredictiveIQ, PredictiveIQ is not entitled to a preliminary injunction.

V.      If The Court Grants PredictiveIQ's Request, PredictiveIQ Must Provide A Bond

Pursuant to RCFC 65(c), the Court may issue preliminary relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The Court should make its judicial interventions "circumspect and infrequent."  *Bona Fide Conglomerate, Inc. v. United States*, 96 Fed. Cl. 233, 243 (2010) (citation omitted); *see also Axiom Resource Mgmt, Inc. v. United States*, 564 F.3d 1374, 1384 (2009) (citation omitted).  "Circumspection would include requiring an unsuccessful bidder, when plaintiff, to post security guaranteeing to make good any

---

[18] Remarks by the Chief of Space Operations, General B. Chance Saltzman, Washington Times, March 14, 2023, https://amp.washingtontimes.com/news/2023/mar/14/space-force-chief-warns-china-russia-deploying-spa/

loss to any party that judicial interference may cause, if it is not ultimately upheld." *Bona Fide*, 96 Fed. Cl. at 243 (citation omitted). The Court must grant defendant's request for a bond.

As the party seeking security, we need only establish a "rational basis" for the amount of security. *Int'l Equity Inv. v. Opportunity Equity*, 441 F. Supp. 2d 552, 566 (S.D.N.Y. 2006); *cf. Amazon Web Services, Inc. v. United States*, 147 Fed. Cl. 146, 159-60 (2020) (requiring security in the amount of $*42 million representing six months of costs and explaining that "some degree of uncertainty or speculation is inherent in defendant's attempt to quantify the harm it may suffer as a result of the preliminary injunction."). When setting security, courts "should err on the high side" because setting the amount of security too low might produce injury, since "the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *E.g.*, *SMC Corp., Ltd. v. Lockjaw, LLC*, 481 F. Supp. 2d 918, 929 (N.D. Ill. 2007) (citation omitted); *cf. Bona Fide*, 96 Fed. Cl. at 243 (explaining that courts that do not require the plaintiff "to post security guaranteeing to make good any loss to any party that judicial interference may cause, if [the preliminary relief] is not ultimately upheld" "will sometimes leave wounds the Court of Claims will be in no position to heal").

As demonstrated in the balance of harms section, above, if a preliminary injunction is issued, the agency has calculated the total cost of the all the awarded contract of $191,013,044.00. The value of the Orbital Prime awardees' contracts is $50,457,024.00, and the Air Force Open Topic is valued at $140,556,020.00. The value of the two contracts that the Air Force has stayed is $3,396,047.15. These values do not include the administrative costs and resources that AFWERX may incur in ceasing these efforts due to the injunction.

Accordingly, if the Court grants a preliminary injunction, the Court should require

PredictiveIQ to post a bond of $673,809., to cover the cost of the two-stayed contractors efforts

for three months.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court dismiss the complaint.

Alternatively, if the Court finds that it possesses jurisdiction, we request that it deny

PredictiveIQ's motion for a preliminary injunction.  If the Court entertains a preliminary

injunction, the United States respectfully requests that the Court require PredictiveIQ to provide

appropriate security pursuant to RCFC 65(c), in the amount of $673,809.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

OF COUNSEL

CHRISTIAN H. ROBERTSON
Trial Attorney
Air Force Judge Advocate General's Corps
U.S. Air Force

PATRICIA M. McCARTHY
Director

___ s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Assistant Director

___ s/ Elizabeth M.D. Pullin
ELIZABETH M.D. PULLIN
Trial Attorneys
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480 | Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-3867
elizabeth.m.pullin@usdoj.gov

MAX V. KIDALOV
Attorney-Advisor (Contracts)
Air Force Office of General Counsel
Legal Counsel to
 the Department of the Air Force Small Business
Programs
Office of the Secretary of the Air Force

May 5, 2023

*Attorneys for the United States*

████████████████████████

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

PREDICTIVEIQ, LLC, )
)
    Plaintiff, )
)
    v. )    No. 232-545
)    (Senior Judge Smith)
THE UNITED STATES, )
)
    Defendant. )
)

### DECLARATION OF DANIEL J. BREWER

I, Daniel J. Brewer, declare as follows:

1.    I am over the age of eighteen years and am fully competent to make these declarations.

2.    I am the Air Force SBIR/STTR Contracting Officer at the U.S. Air Force's Research Laboratory's ("AFRL") Small Business Innovation Research ("SBIR") and Small Business Technology Transfer ("STTR") coordinating office, AFWERX.

3.    I have been a contracts specialist in two centers in Air Force Materiel Command ("AFMC") at Wright-Patterson Air Force Base near Dayton, Ohio, since 2015; I have held an unlimited contracting officer warrant since 2020.

4.    As a contracting officer, my responsibilities under FAR 1.602-2 include ensuring performance of all necessary actions for effective contracting, ensuring compliance with the terms of the contract, and safeguarding the interests of the United States in its contractual relationships.

5.      In my duties as a contracting officer, I regularly coordinate the preparation, release, and administration of solicitations under the SBIR program.

6.      In my capacity as a contracting officer, I also regularly coordinate the funding decisions and proposal selections or non-selections in SBIR procurements.

7.      I was the procuring contracting officer in charge of coordinating the SBIR Program Commercial Solutions Opening Direct-To-Phase-II X23.4, as amended and released to solicit proposals on October 25, 2022 (the "SBIR CSO").

8.      I was the procuring contracting officer for the procurements under the CSO Orbital Prime Topic No. AFX234-DCSO1—each proposal under which could receive funding up to $1.7m—and the procurements under the Open Topic No. AFX234-DCSO2—each proposal under which could receive funding up to $1.25m.

9.      In response to the SBIR CSO Orbital Prime Topic No. AFX234-DCSO1 solicitation—in response to which PredictiveIQ, LLC submitted its proposal—the Air Force selected 30 proposals for contract award and funding (the "Orbital Prime Contracts").  The Air Force did not select PredictiveIQ, LLC's proposal for contract awarding and funding.

10.     I coordinated the evaluations of each proposal submitted in response to the SBIR CSO Orbital Prime Topic No. AFX234-DCSO1 solicitation, including PredictiveIQ, LLC's proposal.  After evaluating each proposal on its own technical merit, I facilitated the process of ranking the proposals to determine the funds available for award.  After the initial evaluation, the Air Force ranked the proposals on January 20, 2023.  The Air Force ranked PredictiveIQ, LLC's proposal as ████████ proposals submitted in response to the SBIR CSO Orbital Prime Topic No. AFX234-DCSO1 solicitation based on the Air Force's first evaluation rating of PredictiveIQ, LLC's proposal under the following factors: Good under the Commercialization

Potential factor; Acceptable under the Defense Need factor; and Excellent under the Technical Approach factor.

11. PredictiveIQ, LLC protested the Air Force's first evaluation of its proposal, after which the Air force took corrective action to re-evaluate PredictiveIQ LLC's proposal. At the conclusion of the Air Force's re-evaluation, the Air Force's second and final evaluation rating of PredictiveIQ, LLC's proposal under the following factors: Marginal under the Commercialization Potential factor; Marginal under the Defense Need factor; and Acceptable under the Technical Approach factor. PredictiveIQ, LLC's ranking went down.

12. The total value of the 30 Orbital Prime Contracts that the Air Force solicited and awarded to satisfy a variety of mission needs equals $50,457,024.00.

13. In response to the SBIR CSO Open Topic No. AFX234-DCSO2 solicitation—in response to which PredictiveIQ, LLC submitted nothing—the Air Force selected 117 proposals for contract award and funding (the "Open Topic Contracts").

14. The total value of the 117 Open Topic Contracts that the Air Force solicited and awarded to satisfy a variety of mission needs equals $140,556,020.00.

15. In total, the Air Force selected 147 proposals for contract award and funding across the various procurements solicited in the SBIR CSO.

16. The total value of the 147 contracts that the Air Force solicited under the entire SBIR CSO and awarded to satisfy a variety of mission needs equals $191,013,044.00.

17. On April 3, 2023, I received notice of the Protest that PredictiveIQ, LLC filed at GAO titled "Re: Protest of PredictiveIQ LLC, Successor-in-Interest to Front End Analytics LLC U.S. Department of the Air Force Solicitation No. Commercial Solutions Opening AFX234-DCSO1" and docketed as "B-421346.2" (the "Protest").

18.     After filed its currently pending Protest at GAO, PredictiveIQ, LLC contacted the Air Force requesting that the Air Force refrain from awarding contracts or order performance of already awarded contracts to be stopped relating to procurements beyond the PredictiveIQ, LLC's Protest against the Air Force's decision not to select PredictiveIQ, LLC's proposal.

19.     On April 7, 2023, the Air Force issued stop-work orders and copies of PredictiveIQ, LLC's redacted Protest to awardees under the SBIR CSO Orbital Prime Topic No. AFX234-DCSO1 solicitation.

20.     Orbital Prime Topic awardee and small business concern, ██████████, contacted the Air Force on April 7, 2023, informing the Air Force that the stop-work order had a direct impact on its team and that it found PredictiveIQ, LLC's redacted Protest to include incorrect and misleading characterizations of the terms of the SBIR CSO and information related to the SBIR CSO that was available to the public.

21.     Having reviewed the request and received advice from legal counsel, the Air Force ultimately determined that the statutory stay requirements did not apply to the awards that PredictiveIQ, LLC sought to stay.  In *gratis* to PredictiveIQ, LLC, however, the Air Force voluntarily stayed the two ███████ proposals that the Air Force awarded under the SBIR CSO Orbital Prime Topic No. AFX234-DCSO1 solicitation (the "Two Voluntarily Stayed Contracts").

22.     By implementing the Two Voluntarily Stayed Contracts, the Air Force and the variety of mission needs it sought to satisfy are suffering the loss of the value of those two Orbital Prime Contracts, which amounts to $3,3963047.00.

23. On April 20, 2023, I received notice of the Complaint, Motion for Preliminary Injunction, and Memorandum in Support of Preliminary Injunction Motion that PredictiveIQ, LLC filed in the present and above-captioned case.

24. In PredictiveIQ, LLC's Motion for Preliminary Injunction filed in the present and above-captioned case, I noted that PredictiveIQ, LLC asked "this Court to enter an order to the Defendant, the United States of America, acting through the Department of the Air Force, to implement the requirements of the Competition in Contracting Act ('CICA') and stay performance of all awards made pursuant to Commercial Solution Opening AFX234-DCSO1 ('Solicitation') while PredictiveIQ's GAO Protest related to the Solicitation is pending."

25. In PredictiveIQ, LLC's Complaint filed in the present and above-captioned case, I noted that PredictiveIQ, LLC seeks relief asking the Court to "[g]rant preliminary injunctive relief, prohibiting the Agency from allowing certain unidentified awardees to perform contracts awarded under the Solicitation until the resolution of this matter on the merits," and defined "Solicitation" as the entire "Commercial Solutions Opening Direct-To-Phase-II X23.4," rather than the Orbital Prime Topic portion under AFX234-DCSO1.

26. Having reviewed PredictiveIQ, LLC's various demands in the present and above-captioned case, I have determined that the Air Force would incur significant costs and monetary damages should the Court grant PredictiveIQ, LLC's Preliminary Injunction Motion to stay some or all of the various awards the Air Force made under the SBIR CSO should the Court later conclude that PredictiveIQ, LLC's Motion should not have been granted.

27. If PredictiveIQ, LLC obtained the stay it requests in its Preliminary Injunction Motion against the 30 Orbital Prime Contracts, the Air Force and the variety of mission needs it

sought to satisfy would suffer the loss of the value of the Orbital Prime Contracts, which amounts to $50,457,024.00.

28. If PredictiveIQ, LLC obtained the stay it appears to request in its Complaint against each of the 147 awards that the Air Force made under the entire SBIR CSO, the Air Force and the variety of mission needs it sought to satisfy would suffer the loss of the value of the Orbital Prime Contracts, which amounts to $191,013,044.00.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 5th day of May 2023.

BREWER.DANIE  Digitally signed by
L.J.1515216096  BREWER.DANIEL.J.1515216096
Date: 2023.05.05 14:50:28 -04'00'
_____
Daniel J. Brewer